**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**YVONNE PLUNKETT**,

    **Plaintiff,**

vs.                                                                            No. Civ. 99-790 BB/RLP

**DEPARTMENT OF HEALTH and HUMAN**
**SERVICES, KENNETH S. APFEL, Commissioner,**
Social Security Administration,

    **Defendant.**

### MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.    This matter comes before the Court on the Motion of Yvonne Plunkett ("Plaintiff") to Reverse the decision of the Commissioner of Social Security denying her applications for Disability Income benefits (DIB) and Supplemental Security Income benefits (SSI). Plaintiff's Motion seeks reversal with instructions to award benefits, or in the alternative, remand to the Commissioner for additional proceedings.

**I.**    **Administrative History**

2.    Plaintiff applied for DIB and SSI benefits, with a protective filing date of November 13, 1996. (Tr. 78, 193). Her claim was denied initially and on reconsideration. (Tr. 60, 197). Plaintiff appeared at a hearing before an administrative law judge (ALJ) on June 25, 1998. (Tr. 22). In a decision dated September 15, 1998, the ALJ found that Plaintiff was not disabled. (Tr. 12-19). The Appeals Council declined to review Plaintiff's claim on June 9, 1999. (Tr. 5-6).

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

**II.     Relevant Facts**

3.      Plaintiff is a high school graduate (Tr. 103) with vocational training as a cashier and dental assistant. (Tr. 103).  She has been previously employed as a cashier, utility manager at a pig farm, car washer and detailer, roofer, nurses' assistant and bartender. (Tr. 103, 134).  She alleges that she became disabled on March 3, 1996, as the result of back problems, a bad knee and a dislocated right shoulder. (Tr.78, 99, 193).  She also alleges headaches three times a month, which last up to 6-7 hours. (Tr. 50)  She complains of unremitting pain which she treats without much relief with over the counter medications (Exedrin, Aleve) and stretching exercises.  (Tr. 26-27, 111-118).   She has declined epidural blocks for pain control (Tr. 46-47), and was prescribed prescription pain medication that she did not take because it "put her out." (Tr. 55).  She states that she has trouble reaching over her shoulder on the right, difficulty holding objects in her hand for more than one-half hour, that she can lift no more than ten to twenty pounds, can remain in one position for no more than 10 minutes at a time, can drive for approximately 45 minutes before she must stop and walk around the car, and that she must lay down and rest every afternoon for 1-1½ hours (Tr. 29-32, 34, 44, 54, 132).

4.      Plaintiff described her daily activities to a consulting physician as follows:

> Ms. Plunkett describes waking at 7:00-7:30 in the morning and starting the day with housework.  She has a seven year old daughter whom she assists in going to school.  Ms. Plunkett denies having breakfast but states she usually has coffee.  She will perform housework during the morning consisting of doing clothes, running the vacuum, sweeping and mopping floors.  She notes needing to take frequent breaks with these activities.  She will occasionally go to visit her mother in the morning.  She has lunch between 11:30 and 12:00 after which she will return to her mother's house or "kick back and do nothing." Occasionally she goes to the store.  At 3:30 her daughter comes home from school and Mrs. Plunkett will go over homework with her daughter.  They have dinner at her mother's house.  At approximately 7:30 to 8:00 Ms. Plunkett assists her child in going to bed.  After this time Mr. Plunkett describes this a alone time which she "tries to do as little as possible" before going to bed just before midnight.

(Tr. 135).

At the time of the administrative hearing Plaintiff described her activities somewhat differently. She testified that she sleeps only 3½ - 4 hours per night due to restlessness. After getting her child to school, she drinks coffee or runs errands or does 2-3 loads of laundry with breaks. She washes dishes, sweeps up to 20 minutes at a time, but cannot sweep and mop in the same day due to pain. She plays cards or dolls with her daughter after school. When in the mood, perhaps 2-3 times per month, she does needlework for a maximum of ½ hour at a time. She drives to pay bills and perform other errands, and visits with her mother and step-father at night. (27-30, 33-34, 37).

5.  Prior to filing her applications, Plaintiff was treated by Jack David, D.C., (Tr. 100, 126). Dr. David provided a summary of care rather than his actual treatment records. The summary states that Plaintiff was underdeveloped, with markedly spastic cervical, thoracic and lumbar spinal musculature which was painful to palpation with localized point tenderness. She also had marked muscle weakness in the upper shoulders, neck and lower back causing instability of the spinal muscles. He stated that neurological and orthopedic testing indicated slow reflexes, limited range of motion and hypersensations in the upper thoracic and cervical tissues. He did not take x-rays. He diagnosed cervical brachial radicular syndrome, cephalgia headache, thoracic subluxation[2], joint pain involving the pelvis and thigh, and myospasms. He felt her condition was guarded due to childhood injuries "which appear to have a profound effect on her present condition." Although he identified one childhood injury, a fall from a window at age 6, landing on her head, he provided no explanation tying this injury to her present condition.

6.  Karyn Rae Doddy, M.D., a specialist in physical medicine and rehabilitation, performed a

---

[2]Subluxation is the incomplete or partial dislocation of a bone in a joint. American Heritage Dictionary of the English Language, 3rd Ed., 1996.

consultative examination on Plaintiff on January 22, 1997. (Tr. 135-141, 152). At that time, Plaintiff complained of chronic knee, back, and right shoulder pain, and fatigue. On physical examination, Dr. Doddy could detect no muscle spasm, effusion, inflammation or instability of the joints or spine, and found no abnormality involving the knee. Range of motion of the shoulder, elbow, wrist, knee, hip and spine was normal. She detected scoliosis[3], with Plaintiff's pelvis being even and her right shoulder approximately 1 cm. lower than the left. Palpation over the ribs was non-tender with adequate breath support. Plaintiff's neurological examination was normal, except for decreased sensation to pinprick over the right upper and lower limbs in a stocking/glove distribution, and the absence of pinprick on the right lateral calf. Plaintiff was able to stand, walk, stoop, sit, squat and bend, and move her lower extremities against resistance. She walked without assistance at a normal to fast speed with good stability and coordination, with no evidence of ataxia, tremor or spasticity. She could grasp, write, pinch and make a fist, with 5/5 strength of both hands, and good fine and gross motor coordination. Based on this evaluation, Dr. Doddy concluded that could lift and carry 25 pounds occasionally and 10 pounds frequently, and that her ability to stand, walk, reach, speak, handle, hear and travel was not impaired.

7. Plaintiff was subsequently seen by Haitham Jifi, M.D. The Administrative record contains two prescriptions written by him for epidural injections for low back pain (Tr. 162), as well reports of radiology studies which he ordered. (Tr. 153-154). As previously stated, Plaintiff did not get the epidural blocks. The radiological studies, performed on April 23, 1997, confirmed the presence of "dextroscoliosis of the lower dorsal and upper lumbar spine." Disc disease was ruled out.

8. Dr. Jifi then referred Plaintiff for a short course of physical therapy consisting of the use of

---

[3]Scoliosis is an abnormal lateral curvature of the spine. Id.

a TNS unit and joint mobilization for right S-I pain. Therapy ended on May 16, 1997, with the notation that Plaintiff had received maximum benefit. (Tr. 190-192).

9. In August 1997 Plaintiff started chiropractic treatment at Cunico Chiropractic Life Center. She was seen 39 times over the next 7½ months. A treatment note dated November 17, 1997, indicates that Plaintiff had been doing much better until a slip and fall the prior day. (Tr. 163-164, 176). She was scheduled to have x-rays if she was not better by the next visit. (Tr. 176). No x-ray report is contained in the file, and a treatment note dated November 21, 1997 states "I think LB is better since the fall." (Tr. 177). Plaintiff continued to have chiropractic treatment throughout 1977.

10. Dr. Doddy performed a second consultative evaluation on December 17, 1997. (Tr. 157-160). Plaintiff again complained of fatigue and chronic pain. She had lost a significant amount of weight[4] and was described as cachectic and malnourished. On physical examination, there was:

> [N]o evidence of muscle spasm, deformity, effusion, inflammation or instability of any effected joints and/or spine. Range of motion [was] within normal limits at the neck, lumbar spine and upper and lower extremities. However, she is noted to become significantly short of breath with performing these maneuvers. There is no evidence of muscular atrophy, although she is noted to be cachexic throughout. Motor tone is fair. Strength is 4+ at the shoulder, elbow, wrist and hand, hip, knee and ankle. She is able to heel, toe walk and squat without difficulty but, as noted above, she becomes short of breath in performing these maneuvers. Muscle stretch reflexes are 2+ at the biceps, triceps, brachioradialis, knee and ankle. Sensory exam is within normal limits for light touch, pinprick and proprioception. There is no evidence of cerebellar ataxia. She is able to stand, walk, stoop, squat and bend without difficulty. Her unassisted ambulation is normal in terms of speed, reduced in terms of stamina and normal in terms of stability. There is no evidence of incoordination, ataxia, tremor or spasticity. She does not utilize any assistive devices for ambulation. She is able to grasp, wrist, pinch, make a fist, had 5/5 grip strength has intact fine and gross motor coordination without tremor, spasticity tone and/or posturing.

Based on this evaluation, Dr. Doddy felt that Plaintiff's ability to perform work related activities had

---

[4]In January 1997, Dr. Doddy's note indicates Plaintiff was 5'3 ½" tall, and weighed 108½ lbs. In December 1997, her height was recorded as 5'5", and her weight as 86½ lbs. (Compare Tr. 136 with Tr. 157).

5

decreased. She indicated that Plaintiff's ability to lift and carry was limited to a maximum of 10 pounds, that her ability to stand and/or walk was limited to a maximum of 4 hours per day, for a maximum of 30 minutes at a time, but that her ability to sit was not impaired.

11. Plaintiff continued to receive chiropractic care thereafter. Treatment notes indicate various complaints, including arm numbness, headache, spasms of the neck and back, and hip and leg pain. Dr. Cunico also noted weight gain to 100 lbs., and improvement in upper back strength. (Tr. 180-189). On March 2, 1998, he signed an authorization for work absence, stating that she should be excused from work from January 1998 - April 1998. (Tr. 166).

### III. The ALJ's Decision

12. The ALJ determined that Plaintiff had "severe" impairments consisting of dextroscoliosis of the lower dorsal and upper lumbar spine, osteoarthritis , cachexia and deconditioning (Finding No. 3, Tr. 18); that these impairments could reasonably cause pain, but that evidence did not support the contention that the pain was disabling. (Findings No. 4, Tr. 18). The ALJ found that from March 3, 1996 to December 16, 1997, Plaintiff had the residual functional capacity to perform her past work as a bartender, which is classified as light exertion by the Dictionary of Occupational Titles. (Finding Nos. 5-6, Tr. 18). He further found that after that date, she was incapable of performing any past relevant work, but had the residual functional capacity for a wide range of sedentary work. (Finding No. 5, Tr. 18). He concluded that she was not disabled after December 16, 1997, applying the Medical-Vocational Guidelines. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.28. (Finding No. 6-10, Tr. 18-19).

### IV. Issues Raised

13. Plaintiff contends that the ALJ erred by:

A.  Failing to give substantial weight to the opinions of treating physicians, without providing good cause therefore;

B.  Failing to order a consultative neurological examination, and

C.  Failing to produce expert vocational testimony.

## IV. Standard of Review

14. The Commissioner's disability determinations are reviewed to determine (1) if the correct legal principles have been followed,[5] and (2) if the decision is supported by substantial evidence.[6] See 42 U.S.C. § 405(b); Bernal v. Bowen, 851 F.2d 297, 299 (10th Cir. 1988); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988). In this review, this court must "meticulously examine the record and review it in its entirety." Id.

## V. Analysis

### A. The ALJ Gave Proper Weight to the Evidence Provided by Plaintiff's Treating Chiropractors.

15. Plaintiff produced records from two treating physicians, Drs. David and Cunico. The ALJ discussed their reports in his decision. He found Dr. David's diagnosis of subluxation to be unsupported by x-ray evidence. The ALJ's rejection of this diagnosis is fully supported by radiographic studies. Other findings noted by Dr. David were unsupported, and indeed contradicted,

---

[5] The Commissioner's decision will be reversed when he uses the wrong legal standards or fails to clearly demonstrate reliance on the correct legal standards. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

[6] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Castellano v. Secretary of H.H.S., 26 F.3d 1027, 1028 (10th Cir. 1994). "The finding of the (Commissioner) as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence is more than a scintilla but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Evidence is not substantial if it is overwhelmed by other evidence of record. Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988). In determining whether substantial evidence exists, the Court does not review the issues *de novo*, Sisco v. Dept. of H.H.S., 10 F.3d 739, 741 (10th Cir. 1993), reweigh the evidence or substitute its judgment for that of the Commissioner. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994). The Court's review will, however, involve a meticulous examination of the entire record. Williams, 844 F.2d at 750.

in subsequent, well-documented examinations by Dr. Doddy. Most importantly, however, Dr. David did not render any opinion as to Plaintiff's ability to work or work limitations. Dr. Cunico prepared an authorization for (work) absence, stating that Plaintiff should be excused from work for a four month period, January 1998-April 1998[7]. (Tr. 166). The ALJ referred to this authorization in his decision (Tr. 15), and also pointed out that a finding of disability requires the inability to work for a consecutive 12 month period. (Tr. 16). See 20 C.F.R. §404.1505(a); 20 C.F.R.§404.1509; 20 C.F.R. § 416.905(a); 20 C.F.R. §416.909.

16. A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. Goatcher v. Dep't of Health & Hum. Serv., 52 F.3d 288, 289 (10th Cir. 1995) (citing Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987). The ALJ, however, did not disregard any opinion expressed by Plaintiff's treating chiropractors, other than the unsupported opinion by Dr. David regarding the existence of subluxation.

17. Accordingly, I find that Plaintiff's complaint of error is without basis, and does not provide a ground for reversing the Commissioner's decision.

**B.** **A Consultative Neurological Examination Was Not Required**.

18. The Plaintiff contends that the ALJ should have ordered a consultative neurological examination. The Commissioner has broad latitude in ordering consultative examinations. See Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 778 (10th Cir.1990). Such examination is often required where there is a direct conflict in the medical evidence requiring resolution, see §20 C.F.R. 404.1519a(b)(4), or where the medical evidence in the record is inconclusive, see Thompson

---

[7]Dr. Cunico treated Plaintiff both before and after the time frame encompassed by the authorization for work absence, and did not revise or extend the period he felt she should be off work.

v. Sullivan, 987 F.2d 1482, 1491 (10th Cir.1993).

19.     A mere allegation, however, is not enough to trigger the need for a consultative examination.

> [T]he starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation. See Diaz, 898 F.2d at 777 (refusing to remand for consultative examination where claimant had failed to present "objective evidence supporting the conclusion that he suffers from depression"). Isolated and unsupported comments by the claimant are insufficient, by themselves, to raise the suspicion of the existence of a nonexertional impairment. See Brock v. Chater, 84 F.3d 726, 728 (5th Cir.1996).

Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997).

20.     At the administrative hearing, Plaintiff's counsel requested that the ALJ obtain a consultative neurological examination. Plaintiff testified that at age six, she had fallen four feet, landing on her head. (Tr. 49). This history was given to Dr. David (Tr. 155) and to the physical therapist who evaluated Plaintiff in April 1997. (Tr. 190). It was not mentioned by Dr. Doddy[8] or Dr. Cunico. The ALJ questioned Plaintiff about this fall. She stated that she had not required hospitalization, but did develop a heart murmur and problems with breathing. (Tr. 49). There is absolutely no evidence of record that Plaintiff suffers from a heart murmur. Breathing problems, when they developed in 1997, were attributed to debilitation. (Tr. 157-158).

21.     The medical records do not support the existence of any neurological problem caused by a fall at age 6. Accordingly, the ALJ was not required to obtain a neurologic evaluation.

**C.     Expert Vocational Testimony Was Not Required.**

22.     Plaintiff's final ground for reversal is that the ALJ erred evaluating her residual functional

---

[8]At the Administrative hearing, the ALJ asked a question indicating his understanding the Dr. Doddy had attributed Plaintiff's headaches and neck pain to this fall. (Tr. 50). A careful review of the record establishes that no such opinion was expressed by Dr. Doddy, and in fact, the fall is not mentioned in either of her reports.

9

capacity for past relevant work as a bartender, and for the full range of sedentary work. She contends that the pain she experiences reduces her residual functional capacity, therefore necessitating the use of expert vocational testimony in evaluating her impairments at steps four and five of the sequential evaluation process. [9]

23. Step four of the sequential analysis involves three phases. First, the ALJ evaluates a claimant's physical and mental[10] residual functional capacity (RFC). Second, the ALJ determines the physical and mental demands of the claimant's past relevant work. Third, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one." Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996).; (citing Henrie v. United States Dep't of Health & Hum. Servs., 13 F.3d 359, 361 (10th Cir. 1993). The ALJ satisfied all phases of the analysis required at step four.

24. The ALJ reviewed the medical findings of Dr. Doddy, who twice evaluated Plaintiff specifically in relation to her complaints of pain (Tr. 13-15; 135-140; 157-160), in arriving at his conclusions relating to Plaintiff's residual functional capacity. Based on the findings of her April 1997 examination, Dr. Doddy concluded that Plaintiff had a residual functional capacity consistent with light exertional work.[11] (Tr. 140-141). Dr. Doddy's evaluation and report is substantial evidence of an ability to perform at the light exertional level. The ALJ then referred to the Dictionary of Occupational Titles, which places the job of bartender in the light exertional range. (Tr. 16); See

---

[9]Of note, Plaintiff does not challenge the ALJ's determination that her claims of pain and other limitations were not credible to the extent alleged. (Tr. 16; Finding No. 4, Tr. 18).

[10]There is no allegation that Plaintiff suffers from any mental impairment.

[11]Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, requires a good deal of walking, standing, or pushing and pulling when sitting is involved. SSR 83-10; 20 C.F.R. §404.1567(b); 20 C.F.R. §416.967(b)

10

Dictionary of Occupational Titles, Vol. 1, 4th Ed., p. 242, (312.474-010). The Dictionary of Occupational Titles is recognized as an authoritative publication by the Social Security Administration. 20 C.F.R. §404.1566(e); 20 C.F.R. §416.966 (e). Finally, the ALJ found that the Plaintiff had the ability to meet the job demands of her prior job as a bartender until December 16, 1997. (Tr. 16-8). No expert testimony was required.

25. In order for a non-exertional impairment to foreclose use of the Medical Vocational Guidelines (grids) at step five of the sequential evaluation process, the impairment must be significant enough to further reduce work capacity. In that event, the ALJ may not rely on the grids, but must give full consideration to all relevant facts, including vocational expert testimony, if necessary in determining whether a claimant is disabled. Channel v. Heckler, 747 F.2d 577, 583 (10th Cir. 1984). The mere presence of non-exertional impairments does not automatically preclude reliance on the grids. Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1971); Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir. 1988); Channel v. Heckler, 747 F.2d at 582, note 6.

26. The ALJ relied on Dr. Doddy's December 1997 examination and evaluation in determining Plaintiff's residual functional capacity after December 16, 1997. Based on the findings of this examination, Dr. Doddy concluded that Plaintiff had a residual functional capacity consistent with sedentary exertional work.[12] (Tr. 159-160). See 20 C.F.R. §404.1567(a); 20 C.F.R.§416.967(a). Dr. Doddy's evaluation and report is substantial evidence of an ability to perform at the sedentary exertional level, despite her allegations of pain. Accordingly, the ALJ did not err in relying on the

---

[12] Sedentary work involves lifting no more than ten pounds at a time, no more than two hours of walking and standing a day, and a total of six hours of sitting a day. SSR 83-10; 20 C.F.R. § 404.1567(a); 20 C.F.R. §416.967(a). The regulations do not specify that the length of sitting time is to be continuous or uninterrupted by changes in posture.

Medical-Vocational Guidelines at step four of the sequential evaluation process.

## VI.     Recommended Disposition

27.     For the reasons stated herein, I recommend that Plaintiff's Motion to Reverse be denied, and that the decision of the Commissioner, denying Plaintiff's Applications for Disability Insurance Benefits and Supplemental Security Income be affirmed.

                                        **Richard L. Puglisi**
                                        **United States Magistrate Judge**